Kathleen E. Brody (Bar No. 026331)
kathy@mscclaw.com
Molly Brizgys (Bar No. 029216)
molly@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
2600 North Central Avenue, Suite 1000
Phoenix, AZ 85004
Telephone: (602) 358-0290

Mukund Rathi (*pro hac vice*)
mukund@eff.org
Adam Schwartz (*pro hac vice*)
adam@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333

*Attorneys for Amici Curiae Central Arizona NLG, Southern Arizona NLG, Mass Liberation Arizona, Poder in Action, and Electronic Frontier Foundation*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Broadcasters Association, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> Mark Brnovich, *et al.*, <br><br> Defendants. | No. 2:22-cv-01431-JJT <br><br> **AMICUS CURIAE BRIEF OF CENTRAL ARIZONA NLG, SOUTHERN ARIZONA NLG, MASS LIBERATION AZ, PODER IN ACTION, AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> (Honorable John J. Tuchi) |

**Amici Statements of Interest**

Amici curiae are advocacy organizations that protect constitutional rights and hold governments accountable through protests, journalism and education, and policy advocacy.

The Central Arizona Chapter of the National Lawyers Guild ("Central Arizona NLG") serves the Phoenix metro region. The independent chapter formed in the 1980s. Among other activities, it runs a Legal Observer (LO) program, which trains individuals to monitor and record police conduct under the supervision of an attorney at protests in Phoenix, Tempe, Scottsdale, and other parts of the greater Phoenix and Maricopa County area. The LO program has a roster of approximately 25 trained individuals.

The Southern Arizona NLG is the regional chapter of the National Lawyers Guild that serves Tucson and Southern Arizona. The chapter formed in the 1990s. It has run an LO program for at least seven years, which trains individuals to monitor and record police conduct at protests. The LO program has a roster of approximately 80 trained individuals. The chapter also provides "know your rights" trainings to protesters, which includes their constitutional right to record the police.[1]

Mass Liberation AZ is a Black-led abolitionist group based in south Phoenix and organizing throughout Arizona. Among other things, it supports protesters who are targeted by police and incarcerated for their free expression. It receives recordings and other documentation of police misconduct from protesters and other community members, and makes those materials available to lawyers for protesters subject to police enforcement or violence. It has held town halls around the state, advanced decarceral legislation, fought for and won police accountability, educated the public on the role of prosecutors in mass incarceration, and targeted prosecutors for their misconduct.[2]

---

[1] The National Lawyers Guild (NLG), of which Central Arizona and Southern Arizona are Chapters, is a nationwide bar association of lawyers, law students, legal workers, and jailhouse lawyers. Each chapter operates independently within the common values shared nationally. NLG Legal Observer programs began in 1965.

[2] Mass Liberation AZ is fiscally sponsored by Tides Advocacy, a California nonprofit public benefit corporation.

Poder in Action is based in the Maryvale neighborhood of Phoenix and builds power to disrupt and dismantle systems of oppression in Arizona. It is led by people of color based on their experiences with injustice in policing and the criminal justice system. It trains LOs to monitor and record police conduct at protests in Phoenix and the surrounding areas. It trains community members on their rights when they encounter police and is a hub for the community's recordings that document police misconduct.

The Electronic Frontier Foundation works to ensure that technology supports freedom, justice, and innovation for all people in the world. It is a non-profit with more than 35,000 active donors, founded in 1990 and based in San Francisco. It represents the interests of technology users in courts and legislatures. It has filed amicus briefs in six cases in support of the First Amendment right to record on-duty police officers.[3]

**Introduction**

HB 2319 violates the First Amendment rights of Arizonans throughout the state, who use their phones and other cameras to record on-duty police within eight feet. Arizonans use these recordings to document police activity at protests, expose false charges against protesters, and inform the public of police misconduct. The First Amendment right to record the police is long-established. *See, e.g.*, *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). This Court must enjoin the Arizona government's unprecedented attempt to criminalize this constitutional right.

Plaintiffs demonstrate that HB 2319 is unconstitutionally overbroad and vague. The overbreadth is "not only [] real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Amici further illustrate this overbreadth through their experiences as community-based organizations that create and use recordings of police within eight feet to hold police accountable and keep their communities free and safe.

---

[3] www.eff.org/issues/right-record.

**Argument**

I. **Arizonans routinely hold police accountable at protests by recording them within eight feet.**

    A. **Legal Observers record the police.**

Legal Observer (LO) programs, such as those run by the Central Arizona NLG, Southern Arizona NLG, and Poder in Action, monitor and record police conduct at protests. They protect the public's constitutional right to protest and hold police accountable. LOs are attorneys, law students, and other community members.

Amici's LOs are trained to place themselves near police to observe police activity but not engage in protest or interfere with police. They use phone cameras, body cameras, and notepads to document police operations, police instructions such as orders to disperse, and police actions such as arrests or uses of force like tear gas and pepper balls. When people are wrongfully charged for their lawful exercise of their right to protest, or when people bring civil rights actions against police misconduct, the LO program provides documentary evidence of what actually took place.

Amici send LOs to protests upon request from organizers or during large spontaneous events, such as the racial justice protests during summer 2020. These protests include anywhere from a handful of attendees to many thousands. Amici deploy from two to eight LOs depending on the protest's size. LOs attend numerous protests every year. Some protests have permits, some are spontaneous, and some involve civil disobedience. During the summer 2020 protests, LOs often attended protests daily.

    B. **Protest activity often occurs within eight feet of police.**

Protesters and LOs need to record where police action is happening. Many will often end up near officers.

For example, there are crowded situations where protesters and counter-protesters are in lines facing off towards each other, with police in between or nearby.[4] Some

---

[4] *See Video shows Flagstaff man confront and pull gun on protesters with police officer nearby*, The Arizona Republic, at 1:51 (July 31, 2020), https://www.youtube.com/watch?v=LD6UOBJEFKc.

-4-

protests, such as those after the murder of George Floyd, are specifically against racism in policing and thus people naturally protest within eight feet of officers on the scene.[5] And at any protest, people may express their disagreement with police conduct and tactics.[6]

To monitor how police treat these protesters, LOs must also be within eight feet. During one of the George Floyd protests in downtown Tucson, for example, protesters stood in a line a short distance from a line of officers. The only way for LOs to monitor the officers was to stand at the end of the two lines, looking down the middle.[7] Officers subsequently detained, pepper sprayed, and tear gassed some of these protesters.

### C.     Views of police activity are often obscured beyond eight feet.

Many protests are filled with visual and audible obstructions. They are often crowded with protesters, bystanders, signs, tables, speakers, props, police officers, and police equipment. They often involve chanting and speaking with amplification. If an LO is forced to be more than eight feet away from police, they will be unable to document police activities.

First, LOs need to capture details of arrests and uses of force.[8] As discussed below, police sometimes falsely accuse arrestees of resisting arrest or of felony aggravated assault of an officer. To provide documentary evidence of what actually

---

[5] https://twitter.com/ZachCrenshaw/status/1267998803711283200 (June 2, 2020) (stand-off with police where protesters chant "I can't breathe"); https://twitter.com/Audreyj101/status/1267994237145985025 (June 2, 2020) (same, chanting "hands up, don't shoot").

[6] https://twitter.com/gaminogabriel/status/1275567221566103552 (June 23, 2020) (argument between protesters and police); Helen Wieffering, *'Instant chaos': Police shot into crowd minutes after beginning to clear road for Trump*, The Arizona Republic (June 26, 2020), https://www.azcentral.com/story/news/local/phoenix/2020/06/26/donald-trump-arizona-visit-phoenix-police-shot-unarmed-protesters/3251400001 (video at 3:30: officers clash with protesters next to police line).

[7] *See, e.g.,* https://twitter.com/Audreyj101/status/1267995393326907392 (June 2, 2020) (stand-off with police where protesters chant "we want change").

[8] *See Police vs. protesters in Arizona*, CNN (July 23, 2010), https://www.youtube.com/watch?v=aDQh9R-k-M0 (officers arrest protesters).

-5-

happened so protesters can defend themselves from false charges, LOs often must be close enough to record details without physical obstructions. For example, people will sometimes gather around police arrests at protests. To monitor the police action, LOs must get to the front of the crowd and thus within eight feet of the police.

A detail that is particularly important for LOs to capture is the badge number and name plate of officers who arrest or use force against protesters. If a protester's civil rights are violated, they need to know who to sue, and if they are wrongfully charged, they need to know who to call as a witness. Badges and name plates are not large, and sometimes are in motion. An LO may not be able to see these items at eye level. Ordinary cameras often cannot capture a legible image of a small item from beyond eight feet, even with a zoom. LOs also must get close enough to document if officers are not wearing their badge or name plate. Further, after an enforcement action, LOs often ask officers for their names and badge numbers. They must be close enough to document the audio of the officers' answers because in some cases they answer only once (or in other cases, are silent or refuse to answer).[9] At a noisy event, ordinary cameras often cannot capture this audio from beyond eight feet.

HB 2319 will effectively impose a no-recording zone of far greater than eight feet around an arrest or use of force, since police often set up a perimeter of officers around such activity. LOs may be pushed back not just eight feet away from the arrest or use of force itself, but from the perimeter around it. At a protest last year in Tucson, for example, an officer was detaining and questioning an LO and there was a perimeter of nearly twenty other officers around them. A fellow LO attempted to record the interaction, but perimeter officers told them to move back, ultimately to nearly 30 feet

---

[9] *See* Chloe Jones, *Tempe PD pepper sprayed demonstrators at Saturday 'chalk walk' protest*, AZ Mirror (June 28, 2020), https://www.azmirror.com/2020/06/28/tempe-pd-pepper-sprayed-demonstrators-at-saturday-chalk-walk-protest; https://www.instagram.com/tv/CB91jGvh25c (June 27, 2020) (video at 0:37–0:53: officers ignore repeated request for identification and badge numbers).

-6-

away. Moreover, perimeter officers often position themselves to block recorders' sightlines.[10]

Second, LOs need to capture details of other police actions. Police might treat counter-protesters more permissively than the main protesters (for example, by threatening to cite the latter group with trespass but not the former) or fail to keep the two groups separate. Police may sometimes give orders to protesters, such as to disperse, from a squad car's loudspeaker; to document who gave the order, an LO must approach the car to ask the officer to identify themselves. Police might use excessive force or retaliate against disfavored speech.[11] Police might fail to give a warning before using force against protesters, so it is important to document police arriving with a new munition (like pepper-ball guns) or equipment (like plastic handcuffs or a long-range acoustic device); the positioning related to the protest; any orders to disperse (or lack of); the time given to comply; and the police action against protesters.[12]

---

[10] *See, e.g., Irizarry v. Yehia*, 38 F.4th 1282, 1292-93 (10th Cir. 2022) (officer unlawfully stood in front of camera and shined a flashlight into it).

[11] https://twitter.com/gaminogabriel/status/1275560586827362304 (June 23, 2020) (police preventing protesters with admission tickets from attending Trump event).

[12] Dave Biscobing, *Police knew 2019 protest arrest was a mistake, MCAO brought charges anyway,* ABC 15 (Feb. 18, 2021), https://www.abc15.com/news/local-news/investigations/protest-arrests/police-knew-2019-protest-arrest-was-a-mistake-mcao-brought-charges-anyway (first video at 4:05: officers tackling a protester who was in the middle of a news interview); Chloe Jones, *supra* n.9 (first and second videos: police pepper spraying and tackling protesters); https://www.instagram.com/p/CBzQtUABfN3 (June 23, 2020) (police advance towards protesters and at 0:59, fire pepper balls); https://twitter.com/gaminogabriel/status/1275573699622494208 (June 23, 2020) (police pepper spraying protesters); https://twitter.com/ZachCrenshaw/status/1266224302296141824 (May 28, 2020) (troopers readying gear and lining up); https://twitter.com/ZachCrenshaw/status/1266226396663123968 (May 28, 2020) (police arriving in riot gear); https://twitter.com/azfamily/status/1287983623971508224 (July 27, 2020) (officers tackling, arresting, and pepper spraying protesters crossing street); https://twitter.com/greg_doucette/status/1268593778878750725 (June 4, 2020) (police tackle protester who yells that he is walking home).

Third, both protesters and LOs often face on-scene retaliation from police for their expression, and close-range recording is necessary to document this.[13] LOs have been targeted, arrested, and removed from the scene, or otherwise intimidated by police to prevent observation and recording.[14] At a protest in Phoenix in August of 2020, a supervising officer singled out an LO from a crowd watching an arrest, forced only the LO to back away, and blocked the LO's sightline. When the LO asked how far back they had to go, the officer named the neighboring town of Goodyear.

In another instance, police followed an LO leaving a protest in Phoenix in September of 2020 and stopped them for a bicycle light infraction. The police falsely cited the LO for refusing to provide their name and date of birth. The LO's own body-worn camera provided the exculpatory evidence – shot within eight feet – that the LO gave this information at the first request.

Fourth, recording from within eight feet is necessary to pick up audible details of police activity at noisy protests. For example, LOs listen for police giving instructions to protesters, such as, "you can't stand there." LOs document who gave the order and what area was forbidden. To do so, the LOs often need to be within eight feet. Afterwards, this recording may show that a protester obeyed a lawful police instruction, or that an officer gave an unlawful instruction. Likewise, a person being arrested may invoke their right to counsel, which an LO can only document if they are within earshot. Finally, LOs ask arrested protesters for their names and dates of birth and need to document their answers, so they can be connected with a lawyer before their initial court appearance.[15]

---

[13] https://twitter.com/ZachCrenshaw/status/1266263492060786689 (May 29, 2020) (police throw recorder to ground).

[14] Chloe Jones, *supra* n.9 (police pepper spraying LO); https://www.youtube.com/watch?v=tqyQFepQrh0 (June 26, 2022) (at 1:35: police detaining LOs and press).

[15] Effective legal representation at an initial appearance can prevent unjust outcomes like defendants accepting plea offers for false charges. *E.g.*, Dave Biscobing, Melissa Blasius, *Phoenix police arrest dozens with copy-and-paste evidence*, ABC 15 (Feb. 4, 2021), https://www.abc15.com/news/local-news/investigations/phoenix-police-arrests-dozens-with-copy-and-paste-evidence.

**D.   Police at protests often move within eight feet of someone recording.**

Stationary LOs and protesters recording the police, through no action of their own, routinely end up within eight feet of roaming police activity. Protests are often large and dynamic. Groups of people move down the street in one or more directions. Others are stationary with individuals moving in and out. Police actions move around too, including arrests, crowd dispersals, and "kettling" (when police surround protesters and prevent them from leaving).[16]

Moreover, officers often approach protesters and LOs.[17] Under HB 2319, they must stop recording or back away. During the George Floyd protests in Tucson, an LO was recording a police action and an officer moved within a few feet of them and yelled at them to move.[18]

Finally, LOs need to continuously record how police behavior progresses over time. LOs can't stop recording every time police come within eight feet of them, and then restart once they are distant again. For example, an LO needs to accurately capture the full chain of events leading to police actions against protesters.

**E.   Recording is often better than note taking at protests.**

While many protesters and LOs carry notepads and pencils, these tools cannot replace recording the police with phones, body cameras, and similar devices.

---

[16] Jacqueline Baylon, Dylan Bank, *4 people who were arrested after a Phoenix BLM protest wound up in ICE custody — and it shows the risk of protesting as an immigrant*, Insider (Oct. 28, 2020), https://www.businessinsider.com/phoenix-protest-black-lives-matter-immigrants-ice-daca-2020-10 (Phoenix police blockaded several downtown streets and arrested over a hundred people); https://twitter.com/ZachCrenshaw/status/1266263341091090433 (May 29, 2020) (police line moving protesters back and within eight feet of recorder); https://twitter.com/Audreyj101/status/1287958646819680256 (July 27, 2020) (police moving arrestee within eight feet of recorder).
[17] https://www.instagram.com/p/CBzQtUABfN3 (June 23, 2020) (police advance towards protesters and LO within eight feet and then fire pepper balls).
[18] *Cf. Schenk v Pro-Choice Network*, 519 U.S. 357, 377-79 (1997) (striking down a 15-foot floating buffer zone that required protesters to back away from people entering or leaving the site of protest).

First, LOs often must ask an officer to state their name and badge number. Officers sometimes state this information very quickly and refuse to say it again. To effectively document the name and number, the LO must record the conversation.

Second, recording can capture quick events and rapidly changing situations at protests, but written notes often cannot. LOs, like other people at protests, are also contending with weather and moving crowds.

### F. Recordings of police within eight feet expose false charges against protesters.

Unfortunately, police and prosecutors have wrongfully arrested and charged protesters for their free expression. Recordings by other protesters and LOs can address this harm. This evidence may show that an officer unlawfully arrested a protester, or that an officer's injury was not caused by an accused protester.

During the 2020 George Floyd protests, video evidence contributed to the dropping of false charges against many protesters in the Phoenix metro area who did not actually obstruct a thoroughfare, assault an officer, or resist arrest.[19] Phoenix police arrested hundreds of protesters from May to November 2020 and prosecutors charged scores of them with felonies.[20] Video recordings of the arrests and surrounding circumstances helped clear these people.

For example, one case was dismissed in July 2021 because of a recording of police within eight feet. Officers arrested a protester in August 2020 and alleged she had an umbrella and "started to swing it back and forth" and "leveled the umbrella" to stab them.

---

[19] *'We've charged innocent people': MCAO accused by protesters of helping to file false charges*, 12News (Mar. 15, 2022), https://www.12news.com/article/news/local/valley/maricopa-county-attorneys-office-accused-by-protestors-helping-file-false-charges/75-dacf415b-c1a0-4ff8-911b-986573082d52.

[20] Dave Biscobing, Melissa Blasius, *Phoenix police arrest dozens with copy-and-paste evidence, supra* n.15; Dave Biscobing, *MCAO, Phoenix PD facing new legal claims for bogus protest gang case*, ABC 15 (Mar. 14, 2022), https://www.abc15.com/news/local-news/investigations/protest-arrests/mcao-phoenix-pd-facing-new-legal-claims-for-bogus-protest-gang-case.

But a cell phone recording within several feet of the arrest proved this was false.[21] Rather, the protester was running past officers when they tackled her. As retired Maricopa County Judge Roland Steinle wrote in his independent review of the county's prosecutions of protesters, "[m]ultiple cell phone videos show [the protester] never swung the umbrella or leveled it."[22]

In July 2019, police likewise falsely arrested and charged an LO with allegedly striking an officer and resisting arrest. Again, cell phone recordings from within several feet of the arrest proved that the Phoenix police reports about this incident were false.[23] Rather, police charged at protesters and LOs peacefully standing on a sidewalk—they later grabbed an LO, took him behind police lines, and arrested him. The case was dismissed after the arresting officer admitted on the stand that both the cell phone recordings and the police's own surveillance video cleared the LO. The latter video was requested by but never provided to the LO's defense lawyer.[24]

Mass Liberation AZ receives recordings and other documentation of police misconduct from protesters and other community members. If a protester and their lawyer approve, Mass Liberation AZ may also share a recording with the news media to inform the public about what actually happened. Even when the media does not publish that recording, journalists may use it to find CCTV footage or other information. At its core, the First Amendment protects sharing such information about police.

---

[21] Dave Biscobing, *Politically Charged: Last Phoenix protest case to be dismissed*, ABC 15 (July 9, 2021), https://www.abc15.com/news/local-news/investigations/protest-arrests/politically-charged-last-phoenix-protest-case-to-be-dismissed (video at 0:54).

[22] Roland J. Steinle, *Review of Maricopa County Attorney's Office's Policy, Procedures & Actions Involving the Protest Arrest on October 17, 2020* at 63 (Aug. 6, 2021), https://s3.documentcloud.org/documents/21041347/final-mcao-report-862140.pdf.

[23] Dave Biscobing, *Police knew 2019 protest arrest was a mistake, MCAO brought charges anyway, supra* n.12 (first video at 2:40 and 4:30; second video at 4:20).

[24] *See Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) ("Bystander videos provide different perspectives than police and dashboard cameras, portraying circumstances and surroundings that police videos often do not capture. Civilian video also fills the gaps created when police choose not to record video or withhold their footage from the public.").

## II. Arizonans routinely hold police accountable throughout their communities by recording them within eight feet.

With digital devices and social media, many Arizonans can be journalists by documenting and informing the public about newsworthy events, including and especially police misconduct. This greatly contributes to the public discussion about police use of force and racism in our criminal legal system.

### A. Arizonans record the police within eight feet to inform the public of misconduct.

Some Arizonans are "cop watchers," meaning they watch in their neighborhoods for police activity, such as traffic stops and sidewalk detentions. They record this activity and may post their recordings online. Other Arizonans might not necessarily be looking for police activity, but when they come across or are subject to it, they do what is increasingly natural to many people: they take out their phone and record.[25]

Like LOs, any Arizonan exercising their right to record may need to do so within eight feet to document details of uses of force, badge numbers, any warnings given beforehand, retaliation against protected activity, and audio of police interactions. Even outside protests, police activity often takes place in noisy environments. Police may be operating, for example, in a busy urban environment with crowds, loud music, and traffic, or in places with intense wind or rain. Police may activate their sirens or use loudspeakers. And even if an Arizonan begins recording a police stop from more than eight feet away, officers will often approach them, so they will have to move away or stop recording.

Recordings within eight feet have documented Arizona police harassing unsheltered people waiting for the bus,[26] unlawfully entering a home and arresting a

---

[25] Dan Brown, *George Floyd's Murder Shows the Urgency of Being and Active Bystander*, BLOOMBERG LAW (May 25, 2021), https://news.bloomberglaw.com/business-and-practice/george-floyds-murder-shows-the-urgency-of-being-an-active-bystander; Lauren Leamanczyk, *What if there wasn't cellphone video of Floyd's death?*, KARE 11 (June 18, 2020), https://www.kare11.com/article/news/local/george-floyd/kare-11-investigates-what-if-a-there-wasnt-cellphone-video-of-floyds-death/89-785d4021-151f-4cb5-8628-f945af01068c.

[26] https://www.instagram.com/p/CFKvbRhnnaH (Sept. 15, 2020).

-12-

naked woman in front of her daughter,[27] forcing a Black person to leave a theater despite having paid for a ticket,[28] dragging a barely responsive person off public transportation,[29] punching and arresting a 13-year-old Black girl during their arrest of another Black person,[30] wrestling two women to the ground over a parking dispute,[31] and pepper spraying a large group of middle school students because three of them were fighting.[32]

### B.  Arizonans use digital devices and social media to create and share recordings.

Today, the widespread availability of mobile digital devices and social media means that the right to record and publish the news extends to far more people than a select few.

---

[27] *Arizona woman sues cops after being arrested naked*, CBS News (July 17, 2015), https://www.cbsnews.com/news/arizona-woman-esmeralda-rossi-sues-chandler-police-officers-violation-naked-arrest. HB 2319 chills the right to record police in one's own home. The law's exception for such recording does not apply if an "officer determines that the person is interfering," apparently authorizing officers to determine this unilaterally. Further, the exception is vague: the resident must be recording "from an adjacent room or area," but it is unclear, including in this video, what "adjacent" means and if it applies to "area" or only "room."

[28] *Man Accuses AMC Theater in Arizona of Racial Profiling; Video Goes Viral*, The Arizona Republic (Mar. 13, 2019), https://www.youtube.com/watch?v=R-dk8IFU6Zw. HB 2319 chills the right to record one's own detention by police. The law's exception for such recording applies to "the subject of a police contact," unless they are "interfering." This is vague, as the law does not define either key term. In this video, an officer uses their hand to block the camera, indicating the officer saw this recording as interference. But of course, such blocking violates the First Amendment. *Irizarry*, 38 F.4th at 1292-93.

[29] https://twitter.com/SoySophiaAlexis/status/1563327887381434368 (Aug. 26, 2022).

[30] Justin Lum, Matt Galka, *Officer seen hitting girl multiple times on video – Phoenix Police say she struck first*, Fox 10 (Feb. 1, 2022), https://www.fox10phoenix.com/news/phoenix-girl-seen-being-punched-by-officer-multiple-times-on-video-department-investigating.

[31] *Video allegedly shows Tucson officer wrestling two women to the ground*, ABC 15 (Nov. 29, 2021), https://www.youtube.com/watch?v=kshkyLmbmgM.

[32] Jessica Suerth, *Activists call on Phoenix middle school to remove officer from campus after pepper spray incident*, 12News (Oct. 26, 2019), https://www.12news.com/article/news/local/valley/activists-call-on-phoenix-middle-school-to-remove-officer-from-campus-after-pepper-spray-incident/75-27de3892-85ae-4725-9206-8c40c4bcb18a.

-13-

As Chief Justice Roberts wrote, cell phones are "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385 (2014). Indeed, 97% of American adults own a cell phone, including 85% who own a smartphone with Internet access.[33] Also, 53% of American adults own a tablet computer with the same capabilities.[34] Globally, there are 8 billion mobile subscriptions.[35] Moreover, modern smartphones have completely changed the way people record videos. With people taking over a trillion photos every year, 89% of them are captured by smartphones equipped with advanced cameras.[36]

The ease with which individuals can document events is complemented by the ease of sharing recordings with others online. 67% of smartphone owners use their devices to share photos or videos, and 35% do so frequently.[37] 7% of U.S. adults post their own news videos on social media, and 7% submit their own content to news sites.[38] Some social media apps allow users to upload recordings previously taken with a smartphone. Others capture audio and video within the apps and post them instantly, making the record-and-publish process seamless.

---

[33] Pew Research Center, *Mobile Fact Sheet* (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile.
[34] *Id*.
[35] Ericsson, *Mobility Report* (June 2021), https://www.ericsson.com/4a03c2/assets/local/reports-papers/mobility-report/documents/2021/june-2021-ericsson-mobility-report.pdf.
[36] Nina Pantic, *How Many Photos Will Be Taken in 2021?*, Mylio Blog, https://blog.mylio.com/how-many-photos-will-be-taken-in-2021-stats; Sascha Segan and Steven Winkelman, *The Best Camera Phones for 2021*, PC Magazine (Oct. 29, 2021), https://www.pcmag.com/picks/the-best-camera-phones.
[37] Aaron Smith, *U.S. Smartphone Use in 2015*, Pew Research Center (Apr. 1, 2015), https://www.pewresearch.org/internet/2015/04/01/us-smartphone-use-in-2015.
[38] Amy Mitchell, et al., *News Video on the Web*, Pew Research Center (Mar. 26, 2014), https://www.pewresearch.org/journalism/wp-content/uploads/sites/8/2014/03/News-Video-on-the-Web.pdf.

Facebook has 2.93 billion monthly active users, over 98% of whom access it through their mobile devices.[39] Every day, Facebook users watch 100 million hours of recordings.[40] Indeed, video now accounts for almost half of all time spent on Facebook, with 8 billion video views a day.[41] Twitter has 217 million daily active users.[42] Tweets with videos are the most popular.[43] There are over 2 billion video views on Twitter each day.[44] YouTube has 866 million monthly active users.[45] Fully 81% of Americans have used the site, to which over 500 hours of new recordings are uploaded *every minute*.[46] Instagram has over one billion monthly active users.[47] Posts with video are the most

---

[39] Statista Research Department, Number of Monthly Active Facebook Users Worldwide as of 2nd Quarter 2022, Statista (Aug. 22, 2022), https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide; Statista Research Department, Device Usage of Facebook Users Worldwide as of July 2021, Statista (Sept. 7, 2021), https://www.statista.com/statistics/377808/distribution-of-facebook-users-by-device.

[40] 99 Firms, *Facebook Video Statistics*, https://99firms.com/blog/facebook-video-statistics.

[41] Mediakix, 13 Facebook Video Statistics That Matter for Businesses and Creators, https://mediakix.com/blog/facebook-video-statistics-everyone-needs-know/#gs.96p9mo.

[42] Salman Aslam, *Twitter by the Numbers: Stats, Demographics & Fun Facts*, Omnicore (Feb. 22, 2022), https://www.omnicoreagency.com/twitter-statistics.

[43] *Id.*; Liz Alton, *How Video is Reshaping Digital Advertising*, Twitter Business, https://business.twitter.com/en/blog/how-video-is-reshaping-digital-advertising.html.

[44] *Id.*

[45] Laura Ceci, Number of Monthly Active Users (MAU) of the YouTube App Worldwide From 1st Quarter 2018 to 3rd Quarter 2021, Statista (Aug. 15, 2022), https://www.statista.com/statistics/1252627/youtube-app-mau-worldwide.

[46] Brooke Auxier and Monica Anderson, *Social Media Use in 2021,* Pew Research Center (Apr. 7, 2021), https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021; Brian Dean, *How Many People Use YouTube in 2021?*, BackLinko (Sept. 7, 2021), https://backlinko.com/youtube-users.

[47] Statista Research Department, *Instagram: Distribution of Global Audiences 2021, By Age Group*, Statista (Sept. 7, 2021), https://www.statista.com/statistics/325587/instagram-global-age-group.

popular.[48] TikTok is a fast-growing platform for short videos and has 1 billion monthly active users.[49]

Many Arizonans use mobile devices and social media to record and publish the news, including how police use their powers.

### Conclusion

Amici respectfully urge this Court to grant Plaintiffs' motion for preliminary injunction.

DATED: September 6, 2022

MITCHELL | STEIN | CAREY | CHAPMAN, PC

By: *Kathy Brody*
Kathy Brody
Molly Brizgys

ELECTRONIC FRONTIER FOUNDATION
Mukund Rathi
Adam Schwartz

*Attorneys for Amici Curiae Central Arizona NLG, Southern Arizona NLG, Mass Liberation AZ, Poder in Action, and Electronic Frontier Foundation*

---

[48] Lindsay Liedke, *25+ Instagram Marketing Statistics You Need to Know*, Startup Bonsai (Nov. 15, 2021), https://startupbonsai.com/instagram-marketing-statistics.

[49] Werner Geyser, *TikTok Statistics – Revenue, Users & Engagement Stats*, Influencer Marketing Hub (Sept. 28, 2021), https://influencermarketinghub.com/tiktok-stats.