Gregg P. Leslie, Gregg.Leslie@asu.edu, Bar No. 035040 *
Zachary R. Cormier, zcormier@asu.edu, Bar No. 034594
Adrienne N. Good, ancastil@asu.edu **
George D. Warner IV, gdwarner@asu.edu **
First Amendment Clinic
Public Interest Law Firm
Sandra Day O'Connor College of Law
Arizona State University
111 E. Taylor St., Mail Code 8820
Phoenix, AZ 85004
Telephone: (804) 727-7398
* Certified supervising attorney pursuant to L.R. Civ. 83.4(e)
** Certified limited practice student pursuant to L.R. Civ. 83.4(e)
*Attorneys for Amicus The Associated Press*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **Arizona Broadcasters Association, *et. al*.,**<br>**Plaintiffs,**<br>v.<br><br>**Mark Brnovich, *et. al*.,**<br><br>**Defendants.** | **NO. 2:22-cv-01431-PHX-JJT** |

**AMICUS CURIAE THE ASSOCIATED PRESS'**
**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION (DOC. 24)**

**I.    Introduction and Statement of Interest.[1]**

Amicus curiae The Associated Press submits this brief for the Court's consideration with the consent of the parties in this case. The Associated Press is a not-for-profit news agency whose members are newspapers and broadcasters. The

---

[1] First Amendment Clinic student Adam Jackson contributed to this brief.

Associated Press operates worldwide, producing more than 2,000 stories every day, and has received over four dozen Pulitzer Prizes. In its role as an international newsgathering agency, The Associated Press regularly sends its photographers and videographers to record footage of public protests and other events which involve interactions between law enforcement and the public.

The U.S. Supreme Court has recognized newsgathering as a protected First Amendment activity. *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see also Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). The First Amendment right to record "is vital to promote the access that fosters free discussion of governmental actions, especially when that discussion benefits not only citizens but the officers themselves." *Fields v. City of Philadelphia*, 862 F.3d 353, 362 (3d Cir. 2017).

The Associated Press' photographers and videographers contribute to the public discourse by gathering and distributing valuable, unbiased news coverage of current events, which enables citizens to form educated opinions about important public issues. HB 2319's unconstitutionally vague and overbroad language will have a negative impact on The Associated Press' (and other newsgathering organizations') First Amendment right to record important news events. The Associated Press supports Plaintiffs' request for this Court to enjoin Defendants' enforcement of HB 2319.

**II.     Argument.**

Under Ninth Circuit law, the balance of equities and the public interest are considered together in the preliminary injunction analysis when the government is a

party. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by, Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *Index Newspapers, LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted)). When a plaintiff "raise[s] serious First Amendment questions," the balance of hardships "tips sharply in [the plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (alterations in original) (quotation marks omitted).

      **A.**    **News coverage contributes to the public discourse.**

The right of the press and the public to have access to information about public activities is "particularly important because it leads to citizen discourse on public issues, 'the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Fields*, 862 F.3d at 359. The press' role in providing news coverage is especially important because it "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self[-]government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982).

To obtain the most complete and accurate news coverage, The Associated Press journalists must often remain in close proximity to the subjects of their recordings. This is especially true during noisy events such as protests. Under those circumstances, if a videographer from The Associated Press attempts to record an interaction between a law

enforcement officer and a protester, HB 2319 would force the videographer to stay outside of an eight-foot boundary, potentially limiting the videographer's ability to fully capture the context surrounding that encounter. Additionally, protests are often fluid situations where, at any moment, law enforcement may move toward protesters (and vice versa), which can make it difficult for journalists to stay outside of an eight-foot floating boundary and potentially expose them to criminal liability. In sum, HB 2319's enforcement will limit The Associate Press' (and other newsgathering organizations') ability to gather full and accurate coverage during newsworthy events like protests, which will in turn stifle public discourse.

**B.     HB 2319's language is unconstitutionally vague and overbroad and will have a chilling effect on the First Amendment right to record.**

HB 2319 must be enjoined because the law's unconstitutionally vague language violates fundamental principles of due process and will interfere with The Associate Press' (and other newsgathering organizations') exercise of crucial First Amendment rights. "A fundamental requirement of due process is that a statue must clearly delineate the conduct it proscribes." *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). A statute is unconstitutional when its language is not "sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (citations omitted).  Insufficiently clear statutes are deemed unconstitutional in order to: (1) avoid punishing people for behavior that they could not have known was illegal; (2) avoid subjective enforcement of laws that

is arbitrary and discriminatory; and (3) avoid any chilling effect on the exercise of First Amendment freedoms. *Id.* In the First Amendment context, where "freedoms need breathing space to survive," specificity and clarity of laws is especially important, and the government may only regulate narrowly. *Id.* at 638–39 (citations omitted).

Here, HB 2319 imposes Class 3 misdemeanor sanctions on the First Amendment protected activity of video recording, with language that is often insufficient to provide notice to the public of prohibited conduct. For example, the law criminalizes video recording of "law enforcement activity within eight feet of the activity." While that seems simple enough, the statute goes on to define "law enforcement activity" in all types of ambiguous ways, including the questioning of a "suspicious person," "enforcing the law" and "handling an emotionally disturbed or disorderly person who is exhibiting abnormal behavior." It is entirely unclear what standards members of the public – or AP journalists – would apply to determine whether and when those requirements have been satisfied and the statutory restrictions implicated.

Further, A.R.S. Section 13-3732(B) purports to exempt from criminal liability certain individuals, provided "the person is not interfering with lawful police actions." Here, too, HB 2319's text fails to provide sufficient clarity to the public.

HB 2319 leaves other questions unanswered. The law provides no clarity about what standards officers will use to determine if individuals recording them have breached the eight-foot barrier the law establishes. Neither does it explain what happens if a video recording begins outside the eight-foot zone and that zone is breached during recording, including, for example, if a law enforcement officer moves within eight feet of the person

1  recording. Moreover, HB 2319's text references "video recording," but it is unclear how
2  officers will distinguish between photographers and videographers. Newsgatherers like
3  the Associated Press deploy both photographers and videographers, and differentiating
4  between the two may prove difficult, especially in hectic settings such as protests. Clear
5  notice of answers to these questions is vital for ensuring compliance with the law during
6  protected First Amendment activity, which HB 2319 fails to provide.

7  Because HB 2319's language fails to provide the public with sufficient clarity
8  about its prohibitions, it poses a risk of punishment for behavior not known to be illegal,
9  subjective enforcement of laws, and a chilling effect upon the exercise of the First
10 Amendment right to record public officials. This violation of due process in the highly
11 protected First Amendment context renders HB 2319 unconstitutionally vague.

12 HB 2319 is also overbroad and allows law enforcement officers to infringe upon a
13 substantial amount of protected speech. Under the First Amendment overbreadth
14 doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected
15 speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).  The Court provided this
16 remedy in relation to the concern that an "overbroad law may deter or 'chill'
17 constitutionally protected speech—*especially when the overbroad statute imposes*
18 *criminal sanctions*." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (emphasis added).

19 HB 2319 would undoubtedly prohibit a substantial amount of protected speech. In
20 addition to being vague, the law's definition of "law enforcement activity" becomes
21 overly broad by including "enforcing the law" within its meaning. While the phrase
22 "enforcing the law" reasonably includes officers seeking to prevent violent criminal

activity, it can also be read to include many of the ordinary, day-to-day activities of law enforcement.

### C. Because of these issues, HB 2319 is so imprecise that it will almost certainly be enforced in a random, unfair, and unclear manner that strongly pushes the balancing of equities here to favor a preliminary injunction.

The ambiguities in the application of this law result in a complete lack of guardrails to keep this law from being applied in unfair and improper ways. In addition to the examples above, it is clear that in the heat of the moment, this statute gives officers the ability to use this law to stop legitimate monitoring of law enforcement actions. No officers presumably will be precisely measuring a moving eight-foot barrier, or making careful determinations of fault or interference, as they would do under existing law. Because the statute does not even require that the person who violates this statute has to be "interfering" with the police activity, the potential for over-application or outright abuse is significant. This potential for gross over-application of this law makes the case that the equities involved here favor an injunction at this point.

HB 2319 threatens to deter local and national members of The Associated Press as they cover major issues of public interest in Arizona.  Within six weeks of the law's passage, journalists could be restricted in their coverage of Arizona's mid-term elections.  Following the results of the 2020 general election, numerous protests took place across the state of Arizona, especially in Maricopa County.  The lead up to the 2022 mid-term election suggests that similar protests will occur. HB 2319 would broadly limit journalists' ability to record such important political events.

HB 2319 threatens to deter local and national members of The Associated Press as they cover major issues of public interest in Arizona. Within six weeks of the law's passage, The Associated Press (and other newsgathering organizations) could be restricted in their coverage of Arizona's mid-term elections. Following the results of the 2020 general election, numerous protests took place across the state of Arizona, especially in Maricopa County. The lead up to the 2022 mid-term election suggests that similar protests will occur. HB 2319 would broadly limit access of The Associated Press (and other newsgathering organizations) to record such important political activity.

### III. Conclusion

Based upon the foregoing, The Associated Press supports Plaintiffs' request for this Court to enjoin Defendants' enforcement of HB 2319.

Respectfully submitted this 7th day of September 2022.

/s/ Gregg P. Leslie
Gregg P. Leslie
First Amendment Clinic
Public Interest Law Firm
Sandra Day O'Connor College of Law
Arizona State University
111 E. Taylor St., Mail Code 8820
Phoenix, AZ 85004